# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 27, 2013 Session

## TERA DANIELLE WARD v. JOHN PATRICK WARD

**An Appeal from the Chancery Court for Montgomery County**
**No. MC CH CV D1-10-257      Laurence M. McMillan, Jr., Chancellor**

---

**No. M2012-01184-COA-R3-CV - Filed June 20, 2013**

---

In this divorce case, the father appeals the trial court's designation of the mother as the primary residential parent of the parties' daughter. The child was born after the parties separated; at the time, the father lived in New Jersey and the mother lived in Tennessee. Divorce proceedings were initiated in Tennessee when the child was six months old; both parents asked to be designated as the child's primary residential parent. After a trial, the trial court declared the parties divorced and designated the mother as the child's primary residential parent; the father was granted parenting time for one week per month. The father now appeals, challenging the trial court's decision to declare the parties divorced and to designate the mother as the child's primary residential parent. After a careful review of the evidence, we affirm the trial court's decision to declare the parties divorced, and reverse the designation of the mother as the primary residential parent of the child. We vacate the parenting plan approved by the trial court and remand the cause for entry of an order and parenting plan designating the father as the child's primary residential parent, with appropriate alternate parenting time for the mother.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Carrie W. Gasaway, Clarksville, Tennessee, for the Defendant/Appellant, John Patrick Ward

Mary Frances Parker, Murfreesboro, Tennessee, for the Plaintiff/Appellee, Tera Danielle Ward

## OPINION

### FACTS AND PROCEEDINGS BELOW

In February 2008, Plaintiff/Appellee Tera Danielle Ward ("Mother") and Defendant/Appellant John Patrick Ward ("Father") met at a bar in Nashville, Tennessee. At the time, Father lived in New Jersey, and Mother lived in Clarksville, Tennessee, with her eight-year-old son from a previous marriage, "J.R." Within a day or two after they met, the parties became intimate. They then went their separate ways.

The parties did not see each other again until August or September 2008, when Mother flew to New Jersey to see Father. They embarked on a long-distance romantic relationship.

In May 2009, the parties were married in Clarksville. At the time, Mother was pregnant with the parties' daughter, the child at issue in this appeal. After the wedding, Father returned to New Jersey. Father has a large extended family in New Jersey and worked in a business owned by a family member. After about three weeks, Mother and J.R. moved to New Jersey to live with Father.

The parties' marriage proved tumultuous from the beginning. After eight weeks of discord, in mid-August 2009, Mother left the parties' home to stay with a friend. When Mother returned home, she found Father moving her personal belongings into a U-Haul. Mother went back to stay at her friend's house.

A few days later, Father called Mother and told her that he was on the road driving to Tennessee with the loaded U-Haul; he said he would fly her from New Jersey to Tennessee to meet him. According to Mother, Father led her to believe that the two of them would eventually live together in Tennessee. That did not prove to be the case. Father moved Mother into an apartment in Tennessee, but stayed there with her only four or five days before returning to New Jersey. At some point during this time, J.R. was sent to stay with his father. The parties never reconciled, so Father remained a resident of New Jersey and Mother lived in Tennessee.

In December 2009, Mother gave birth to the parties' daughter, "S.W." Father traveled to Tennessee and was at the hospital for the birth of the child. He stayed in Tennessee for about ten days after the child was born, and then he went back to New Jersey.

In March 2010, Father brought his brother, James Ward, and his friend Jana Collins to Tennessee to visit for five days. According to Father, he had planned to stay in the apartment with Mother and S.W. for the five-day visit. Once he arrived, however, Mother changed her

-2-

mind and told him he "couldn't come near the apartment." Mother asked Father to have his friend Ms. Collins pick up infant S.W. from Mother for the child's visit with Father. When Ms. Collins arrived to pick up S.W., Mother admonished Ms. Collins that Father had better return the child to Mother within one hour or she would call the police. The child was returned to Mother within the hour, as demanded, and Father did not see S.W. any further on that trip.

In May 2010, Mother flew to New Jersey with S.W. She and S.W. stayed in New Jersey for two or three days for the child to visit with Father. Father had no more parenting time with the child before the divorce proceedings were initiated.

On June 14, 2010, when S.W. was about six months old, Mother filed a complaint for divorce in the Chancery Court for Montgomery County, Tennessee. As grounds, Mother alleged irreconcilable differences and inappropriate marital conduct. Mother asked the trial court to designate her as S.W.'s primary residential parent, and to award her child support, temporary spousal support, and attorney fees.

In July 2010, before Father filed his answer to the complaint for divorce, Mother brought infant S.W. to New Jersey. For reasons that do not appear in the record, Mother did not tell Father in advance that she was going to visit New Jersey or bring the child. Evidence in the record indicates that, at about 11:30 a.m. on July 10, 2010, the day Mother left Tennessee, she began sending text messages to Father, telling him that she wanted for her and S.W. to spend the weekend with Father. At the time, Father was at his family beach house with his mother, sisters, several young nieces, and other family members, and he did not reply to Mother's text messages. After several of her text messages to Father went unanswered, Mother sent him text messages that included "a lot of foul things," saying that if he did not respond to her texts, she would come straight to his family's beach house.

As indicated in her text messages, around 9:00 p.m. that evening, Mother arrived at Father's family beach house with S.W. in her vehicle. When she arrived, she began pounding on the door to the beach house, shouting expletives and demanding that someone open the door. In view of Mother's behavior, Father and his family did not open the door, and instead called the police. When the police officers arrived, they observed Mother "banging and kicking the back door" and "yelling and cursing for someone to open the door." Father did not allow the police to enter his house, and instead he went outside. When Father came out, he saw S.W. in the back of Mother's car, so he took the child out of the car and brought her into the house. Father refused to return the child to Mother that evening. Mother was not taken into police custody, but she agreed to allow S.W. to stay overnight with Father. The next day, Father still refused to return the child to Mother.

-3-

The day after that, on July 12, 2010, Mother filed a motion with the Tennessee trial court, asking the trial court to issue an order requiring Father to return S.W. to her. At the same time, Mother filed a petition in a New Jersey state court, asking for the same relief. The New Jersey court ordered Father to return S.W. to Mother.

The following day, on July 13, 2010, Father filed his answer to the divorce petition in the Tennessee trial court below. He denied Mother's allegation of inappropriate marital conduct and asked the trial court to designate him as S.W.'s primary residential parent. He later filed a counterpetition, seeking a divorce on the grounds of irreconcilable differences, as well as inappropriate marital conduct and adultery by Mother.

On July 30, 2010, Father filed a motion to set a *pendente lite* parenting schedule. In the motion, Father asserted that Mother "refused to allow [him] to visit the child, other than a very few times that she chooses, and threatens him with arrest if he tries to come see his daughter without her blessing." Mother filed a response to Father's motion, denying his allegations. She also filed a "memorandum" asking the trial court to grant Father only supervised parenting time, and asking the trial court to order him to pay her *pendente lite* child support, spousal support, and attorney fees.[1]

On August 6, 2010, the trial court conducted an evidentiary hearing on the parties' motions. Both parties testified at the hearing. At the conclusion of the hearing, the trial court rendered an oral ruling, and on August 25, 2010, the trial court entered a written order to the same effect as the oral ruling. Neither the oral ruling nor the written order contained any findings of fact or conclusions of law; both simply stated the relief ordered. The trial court granted Father unsupervised parenting time with S.W. on the third weekend of each month. However, the trial court required Father to have his parenting time with the child in Tennessee, with all travel expenses borne by Father, and it permitted him no overnight parenting time. The order stated that the child was "not to leave Montgomery County and/or the State of Tennessee."[2] Father was ordered to pay Mother $1,200 per month in child support and to provide the child with medical insurance.

---

[1] Mother did not file a motion for supervised parenting time or *pendente lite* support, so it is unclear what "request" this memorandum was intended to support. As part of the facts recited, the memorandum includes Father's failure to return the child to Mother in New Jersey, but it does not state specifically the reason for the request for supervision of Father's parenting time.

[2] When the trial court announced the conditions on Father's parenting time at the end of the hearing, it declined to answer the inquiry by Father's former attorney as to the reason the trial court would not permit Father to take the child to New Jersey for his parenting time or have overnight parenting time.

On September 24, 2010, Father filed a motion to reconsider and/or to modify the August 25 order regarding his parenting time. Father asked the trial court to lift the restrictions on his parenting time to permit him to bring the child to New Jersey to visit with his extended family. Father also asked the trial court to reduce his support payments. On November 30, 2010, the trial court entered an order denying Father's motion.[3] The order included an injunction prohibiting guests of the opposite sex from staying overnight (specified as 11:00 p.m. through 7:00 a.m) when the minor child was present. The order stated that the injunction applied to both parties, but effectively applied only to Mother because the trial court had permitted Father no overnight parenting time.

On December 17, 2010, Father filed a contempt petition against Mother, including a notice of criminal contempt. The petition alleged that, 72 hours after the trial court issued its oral ruling, Mother violated the trial court's injunction by moving herself, S.W., and her son J.R. into the home of her paramour, Reed Baldwin. Mr. Baldwin was married at the time, although obviously not to Mother. Father alleged that Mother's disregard of the trial court's injunctive order was knowing and intentional. Father also alleged that Mother and Mr. Baldwin, with S.W. in the car, chased down a private investigator who was following Mother and ran the private investigator's car off the road.

Soon after filing the contempt petition, Husband filed a motion to compel Mother to respond to his outstanding discovery requests. Mother filed a response to Father's contempt petition and finally responded to Father's outstanding discovery. In her response to Father's contempt petition, Mother admitted that she "moved into the home of her boyfriend," Mr. Baldwin. She claimed, however, that she was not violating the trial court's injunction against overnight visitors of the opposite sex "inasmuch as her boyfriend stays with his parents from 11:00 p.m. until 7:00 a.m." Mother denied violating any other of the trial court's orders, and asserted that Father's contempt petition was "simply another frivolous attempt . . . to obscure the real issue which is that [Father] has not been involved in the child's life . . . ." The trial court did not rule on Father's contempt motion before trial.[4]

The trial court conducted the parties' divorce trial on June 29, 2011. The primary dispute was the parenting arrangement for S.W., so the testimony centered on which parent should be designated the child's primary residential parent. At the time of trial, Father was about 40 years old, Mother was about 30 years old, and daughter S.W. was approximately 18 months old.

---

[3]Also in this order, the trial court denied Father's motion to require Mother to undergo hair-follicle drug testing, and it continued indefinitely Father's motion to compel discovery from Mother.

[4]Father was not granted contempt relief against Mother at the trial.

Mother was first to testify. As background, after Mother graduated from high school, she married J.R.'s father (hereinafter "J.R.'s father"). When they separated, Mother and J.R. moved into an apartment with one of Mother's friends for about two months. From there, Mother and J.R. moved into another apartment, where they lived for eight years. At the time Mother met Father, she was working at the E-911 Center of the Clarksville Police Department. When she married Father, she quit that job and moved to New Jersey.

Mother said that her marriage to Father was difficult from the start. She testified that they argued constantly. After about eight weeks of marriage, the arguing prompted her to leave Father's home in New Jersey to stay with a friend. When Mother returned home, she found Father and a crew moving her personal belongings into a U-Haul. Mother said that she told Father that she did not want to move back to Tennessee, and that she wanted them to attend counseling. She said that Father told her that they would make their life in Tennessee and that he would work in the real estate industry. But after Father went back to New Jersey, Mother said, he never returned to live with her in Tennessee.

Mother testified that, after she separated from Father and moved back to Tennessee, she began working at a local bar and grill. Tracy O'Conner lived with Mother and S.W. for about two months and babysat the child in lieu of paying rent. Mother sent J.R. to live with his father and paternal grandmother ("J.R.'s grandmother") during this time; she explained that it was necessary because she had no car and she did not live in J.R.'s school district.

In her testimony, Mother admitted that, during her marriage to Father, she engaged in sexual relationships with at least five other men.[5] One of her sexual partners was John Baumgartner. Mother testified that Mr. Baumgartner was not her boyfriend, but she accepted financial assistance from him — $3,000 to buy a car, and other funds to purchase a computer. Mother admitted that, "possibly one or two times" while she and Mr. Baumgartner were having sexual relations, S.W. was in the same house in her portable crib. Mother identified three other men with whom she had sexual relations, but said that those sexual liaisons occurred while S.W. was in the care of a babysitter, Jennifer.

---

[5]Mother was asked, "And that wasn't something your husband forced you to do?" Mother replied, "No. He enjoyed it."

Mother, J.R., and S.W. moved into Mr. Reed Baldwin's home in October or November 2010.[6] At the time, Mr. Baldwin was married but apparently separated from his wife. Mother gave varying testimony about the sleeping arrangement for S.W. while they lived in Mr. Baldwin's home. In her deposition, Mother testified that the child slept in a "big-girl" bed on the floor of the bedroom, purportedly because S.W., then one year old, was "too big" for a crib. In the deposition, Mother said that S.W.'s feet touched the ground, so she believed that the child could not have gotten hurt. At trial, however, Mother claimed that S.W. slept in a portable crib when she was in Mr. Baldwin's house. During that time, Mr. Baldwin drove J.R. to school each morning. Mother admitted that she posted photos of S.W. with Mr. Baldwin on her Facebook page, and she even sent Father pictures of S.W. resting on Mr. Baldwin's chest.

A few months after Mother and the children moved in with Mr. Baldwin, he ended the relationship in order to reconcile with his wife. Mother, J.R., and S.W. then moved in with Mother's father and his wife. A few weeks after Mother and the children moved in with her father, Mother said, she bought S.W. a crib.

During Mother's relationship with Mr. Baldwin, he paid for both of them to have each other's names tattooed on their bodies. Mother had Mr. Baldwin's name tattooed on her "pubic bone." Father's attorney asked Mother, "[Y]ou sent a photograph of that tattoo to [Father], didn't you?" Mother replied, "It would not have been of the tattoo. It would have been of my vagina, ma'am, and I'm sure the tattoo was present."

The evidence at trial demonstrated that sending photos of her genitals to which Mother referred in the above testimony was not an isolated incident for Mother. The record contains approximately a dozen very explicit photographs of Mother, either alone or with a pregnant friend, naked in a variety of sexual poses.[7] Mother identified the pregnant woman posing with her in the explicit photographs as her friend Brandi, a former girlfriend of Father's brother.

Mother testified at trial that she sent these and other similar photographs via text message to Father, his brother, and other men. Mother admitted that she sent at least one explicit picture

---

[6]Mr. Baldwin was the nephew of the owner of the bar and grill where Mother worked. Mother acknowledged that her employment at the bar and grill was terminated, but she denied that it was terminated because of her relationship with Mr. Baldwin. Mother conceded, however, that the owner of the bar and grill did not approve of the relationship.

[7]The photos include closeups of the women's vaginas with the women inserting things into each other.

to a New Jersey police officer after the incident at Father's family home in July 2010. Asked if she sent similar photographs to Mr. Baumgartner, Mother said she didn't recall.

The collective trial exhibits comprised of the sexually explicit photographs of Mother and associated text messages indicate that at least some of these pictures were texted to Father on July 3, 2010, after Mother filed for divorce but before she showed up uninvited at the New Jersey beach house. Mother's initial testimony indicated that she intentionally sent the photographs to Father because she "figured he would enjoy the pictures," but she then claimed they were sent to Father "by mistake." Finally she said that only some were sent to Father on purpose, while all were sent to Father's brother. Father responded to the explicit text photos by telling Mother that she was "endanger[ing] the well being of my daughter" and asking Mother "please if you and your hooker friend could refrain from engaging in such acts, for the safety of my child, it would be greatly appreciated." Mother at first responded, "Me and [B]randi wouldn't do such a thing," and then texted Father about how "beautiful pregnant" Brandi looked in the explicit photographs.

Mother's sexual philosophy apparently evolved while the divorce proceedings were pending. In her deposition, Mother asserted: "[A]s a young woman, I believe we, as adults — I think we can have or choose to be intimate with someone if we choose to." By the time of trial, Mother said that she did not recall making such a statement in her deposition and claimed that she regretted all of her past sexual mistakes. Mother claimed that she had never sent sexual photographs of herself by text until Father "introduced" her to it, but by the time of trial she said, "I do see that there's a problem with that." She added: "We live and we learn."

The record includes transcripts of recordings of telephone conversations between Father and Mother, recorded by Father without Mother's knowledge. In one expletive-laced conversation, Father was on the telephone with Mother while Mother was in her car with daughter S.W. in the back seat:

> FATHER: Just slow down. Put your seatbelt on, 'cause you're out of control. You almost got into a car accident.
>
> MOTHER: I didn't f___ing almost get into a g__d__ car accident, because I was speeding, or wasn't paying attention, or that I was rushing. It wasn't my g__d__ f__ing fault you got us at a point where you tried to (inaudible) the road. . . .
>
> FATHER: (inaudible) I told you not to speed, and you said, "I am going to speed."

MOTHER:     F__ you.  I've got a g__d__ red light.  Why don't you f__ing get your g__d__ facts before you f__ing start accusing somebody.

FATHER:     Are you almost there?

MOTHER:     (inaudible) what you know.  You don't give two f__s about me.  You made it very clear.

FATHER:     You have to unstrap [S.W.] and take her in before you go reach your belt — your purse. . . .

MOTHER:     Of course, I'm gonna take her in with me.  I'm gonna take that extra five minutes to take her out, so don't worry your pretty little head off, okay. . . .

FATHER:     Why are you being like this for?

MOTHER:     No reason. No reason. You're such a loving, sweet, devoted husband and father.  You're so great at everything.  I don't know.  I guess I'm just gonna let you go so, you know, rude little me can get off the phone and go do my own little thing.

FATHER:     Tera, I have no idea why you've turned into this — you know, where you were mean all day but now you're, like, completely out of control mean. You left your purse behind. That's not your fault.  I offered to help you.  I hear you —

MOTHER:     I'm gonna go.

FATHER:     I hear you flooring it, Tera.

MOTHER:     Leave me alone.  F__ing go worry about somebody else.  Don't worry about me at all, okay.

FATHER:     Is your seatbelt on yet?

MOTHER:     No, I don't.  Ooh, go tell your f__ing g__d__, c__-sucking lawyer that.  Go f__ing tell her.  Ooh, tell her I'm speeding too.  Oh, my God, the judge'll love that one.  F__ing joke.

In the recording, Mother is at times fairly shrieking at Father over the telephone. The dates of the conversations are not noted on the recording or the transcript, but Father claimed they took place during the few weeks prior to trial. Mother explained at trial that, in the above conversation, the "joke" to which she referred was Father's conduct in the divorce litigation.

At the time of trial, Mother was working full time at a trucking company earning an hourly wage. Mother and the children were still living with Mother's father and his wife, and S.W. was staying in daycare while Mother worked from 7:30 a.m. to 4:30 p.m. Mother described her family as very close-knit. She acknowledged that her stepbrother had legal troubles related to possession of drugs. Mother said that her stepbrother was "not living" in her father's home with them, he was only "staying there" in transition. Mother conceded that Father had told her that he did not want S.W. around the stepbrother, but she discounted Father's concerns, commenting that he "doesn't want anyone around my daughter, including my family."

Mother testified about Father's limited parenting time with S.W. in his visit to Tennessee in March 2010. She claimed that Father only requested one hour of parenting time with the child during the five-day visit. It was Father's choice to not visit with the child more than one hour during his five-day trip, Mother insisted; she said that "he could have seen his daughter as long as he wanted." Mother explained that she threatened to call the police if he did not return S.W. within that time only because she was afraid that he might take the child back to New Jersey.

Mother was critical of Father's care of S.W. when the child was only a few months old, but by the time of trial said that S.W. "seems fed and well taken care of" after her visits with Father. She added, "He seems to be good with her; still in the learning process, but doing a lot better." She claimed that Father chose not to exercise all of the parenting time to which he was entitled. Typically, Mother described, she takes the child to Nashville and drops her off with Father at around 12:00 or 1:00 p.m., and Father brings her back between 4:00 or 5:00 p.m. Mother said that Father sometimes pays his child support late, but said that he was current as of the time of trial.

Mother acknowledged that she had disagreements with Father over her parenting of J.R., almost 11 years old at the time of trial. Mother was asked about a couple of incidents Father had described. In the first, J.R. did not want to eat the carrots Mother had served him. Father claimed that Mother piled more carrots on his plate and forced him to eat all of them. Mother denied that she put more on the child's plate, but admitted that she made him eat them. Mother was asked about another occasion when Mother, Father, and J.R. were at an amusement park, and J.R. did not want to ride certain rides he thought were scary:

Q. And you made [J.R.] go on those rides?

A. Yes.

Q. And [J.R.] was crying?

A. Before he got on them, yes.

Q. And —

A. Then he was mad.

Q. And you were laughing at him?

Q. Ma'am, there was three- and four-year-olds on these rides, and he was nine at the time, so . . .

Mother admitted that she laughed at J.R. for being scared of going on the ride, but asserted that Father laughed at him, too. She also admitted that she took a photograph of J.R. while he was crying, but added that the child was only "pretending to cry" when he was actually mad. She emphasized that J.R. is a straight-A student and is well adjusted.

Mother testified that J.R.'s father had filed a petition to modify their parenting plan, seeking to be designated as J.R.'s primary residential parent. She claimed that the petition was triggered by the situation between Mother and Father in this case, because she and J.R.'s father "had gotten along great for nine years." Mother admitted that she no longer had a harmonious relationship with J.R.'s grandmother. She denied threatening J.R.'s father that he would never see J.R. again if he helped Father in the instant divorce proceedings; she also denied threatening Father that he would never see S.W. again if he helped J.R.'s father in his custody proceedings, adding, "I can't keep either one from seeing their child."

Mother testified that the trial court should designate her as S.W.'s primary residential parent because she had been the child's caregiver all of the child's life. She did not take a position on how much parenting time Father should be awarded. Mother acknowledged that she had previously objected to Father taking S.W. to New Jersey, but by the time of trial she had "no problem with [S.W.] going up there once something is in writing," and she wanted the child to have the opportunity to visit with Father in his hometown with his family around.

Father also testified at trial. As background, Father earned a degree in business administration at Pace University and then moved to Nashville. He opened a nightclub there

in 2001; in 2005 the nightclub closed and Father moved back to New Jersey. At the time of trial, Father was employed as director of operations at a property management company in New Jersey owned by his brother, James Ward, earning approximately $500 per week.

Father attributed the parties' separation to Mother's combative behavior and their frequent arguments. During their short time together as a married couple, he said, they fought and yelled every single night. Father described Mother's behavior as verging on the paranoid; he said that she texted and called him constantly to see where he was. Mother often accused Father of cheating on her, he testified, and Father had to constantly prove to her that he was not: "I'd have to take pictures to prove where I was at that moment and send them to her." In the course of an argument early in their marriage, when Mother was pregnant with S.W., Father recounted, as he started to walk away Mother grabbed a butcher knife, held it to her stomach and threatened, "If you walk out that door, I swear to God, I'll F'ing kill her."

Father also said that some of their disagreements were over Mother's parenting of J.R.: "I just completely disagreed with the way she was parenting him." He recounted an occasion where he and Mother and J.R. were at a restaurant, and Mother told J.R. to order a filet. J.R. responded, "What's filet?" Father said that Mother grabbed the child's arm and squeezed it so hard that J.R. began screaming. When Father told Mother to stop, she snapped, "Don't ever tell me how to raise my son." Father said that the incident left him feeling horrible for J.R. and in shock. Father also testified about another occasion when he and Mother were in bed having sexual relations. Father realized that the door was cracked and J.R. was just down the hallway, so he got up to close the door. Mother told Father not to close the door and yelled to the child, "[J.R.], don't you dare come down this hallway." Father closed the door and locked it anyway. Recalling that incident gave Father concern about Mother's admission that she was having sexual relations with various men while S.W. was in the house. Father testified about another occasion when he was with J.R. after another one of the many shouting matches between Father and Mother. Father recalled that J.R. turned to him and said, "You won't stay. None of them do."

Father asserted that, when he and Mother separated and he moved her into the apartment in Tennessee, he paid all of her expenses.[8] When S.W. was a newborn, Father said, he was paying all of their bills and did not have a lot of money available to buy plane tickets to visit the infant in Tennessee. He testified that, since the August 2010 order was entered, he had seen S.W. at least once a month, and sometimes twice. Father said that he loves S.W. and

---

[8]Contrary to Father's testimony, in the earlier proceeding on *pendente lite* support and parenting issues, Mother testified that Father "dropped me off down here [in Tennessee] . . . with no car, pregnant, no job, nothing, no money." Mother asserted that, during the divorce litigation, Father threatened to "starve" her into submitting to his demands regarding the terms of the divorce.

wants to spend as much time with her as he is allowed. He said he had asked Mother to allow him to take S.W. to New Jersey for a visit, because his mother is elderly and cannot travel, but Mother always refused.

Father testified about the July 2010 incident in New Jersey when Mother drove to New Jersey and showed up at his family's beach house. He stated that, when she arrived, Mother began kicking the door and screaming the "F" word, adding, "When she's angry, she curses an awful lot." Once he went outside, Father said, he realized that young S.W. was in the back seat of Mother's vehicle, so he took her out. He explained that he refused to give the child back to Mother because Mother was acting out of control and he did not feel it was safe.

Father testified about his five-day trip to Tennessee in March 2010. Contrary to Mother's testimony, Father said that he wanted to spend the entire five days enjoying his new daughter. But when he arrived, Mother told him not to come near her apartment or she would have him arrested, and she refused to let him spend more than one hour with the child.

Father said that most of his extended family lives in New Jersey, including his brother James Ward, his mother, and his three sisters. He described his family as "the closest family I've ever known," and said that many people, including Mother, had commented to that effect. He said that virtually his entire family works together; they see each other every day and get along very well. Father's family includes three nieces and a nephew, ranging in age from eight months to eight years old. Father was excited about the prospect of bringing S.W. to New Jersey to be with his family; he said that his family members were all very supportive of his decision to seek primary residential parent status. Father submitted into evidence pictures of S.W. with Father's family when she was at the beach house in July 2010.

Father testified that he had exercised most of his parenting time with S.W. in Tennessee. It was difficult, he said, because he was not allowed any overnight parenting time and most of his parenting time was spent at retail stores or malls pushing the child around in her stroller. Father said that he places great importance on attending church and his family attends church regularly. He said that he had taken S.W. to church "every single time I've been with her." Father took photographs of himself with S.W. during his parenting time, and the photos were submitted into evidence.

At the time of trial, Father was living by himself in a two-bedroom apartment in a complex owned by brother James Ward, and Father was paying rent to his brother. Father said that he is surrounded by his family; his mother resides in an apartment across the hall from him, and his sister lives in another apartment unit in the same complex. Father prepared one of the bedrooms in his apartment for S.W to stay in during his parenting time with her, and he submitted photographs of the bedroom into evidence. He emphasized that he had made the

entire place childproof, including door handles, toilet lids, and kitchen cabinets, in preparation for S.W.

Father submitted to the trial court a proposed parenting plan that designated him as the primary residential parent. He testified that even though his parenting time with S.W. had been limited, he had acquired good parenting skills by playing a big part in raising his three nieces. If he were designated as primary residential parent, Father testified, one of his sisters would stay home and keep S.W. while he was at work, free of charge. In this way, Father explained, S.W. would see several members of her paternal family on a daily basis.

Father said that he was hurt when Mother posted photographs of Mr. Baldwin and S.W. on her Facebook page. He testified that he did not want Mother's sexual partners around his daughter. Father said he did not believe that Mother's living arrangement with her father was permanent. Father pointed out that, in contrast to Mother, he had his own home; he asserted that S.W. would be more stable and "much safer with me as the primary parent."

Father testified that he would never try to keep Mother from seeing S.W.: "She's [S.W.]'s mother, and that's very important to me, and I . . . want us all to get along." He claimed that he would do everything he could "to make it easier on [Mother] to enjoy being [S.W.]'s mother." He contended that Mother had tried to make it difficult for him to spend parenting time with S.W.

Father acknowledged that the parties acquired no property during the marriage, so there was no marital property to be divided. Evidence showed that Father was in debt to his brother James Ward; Father borrowed money from his brother first for his nightclub and then for his legal fees and other expenses related to this divorce litigation. The record contains promissory notes documenting the fact that Father owes James Ward a total of approximately $90,000.

Various other witnesses testified at trial. Brittney Barns, Mother's friend and former co-worker, testified on Mother's behalf. She said that Mother is a good parent. Mother's father ("Grandfather"), corroborated Mother's testimony that she and the children moved into his house about three or four months prior to trial. He said that Mother is a good mother and takes care of her children's needs. He acknowledged that J.R. has frequently stayed with him in the past; Grandfather commented that his home is always open to his grandchildren. Grandfather admitted that Mother becomes volatile when she is angry. On one occasion when Mother was 18 years old, he acknowledged, she hit his wife in the face with a telephone. He conceded that Mother uses foul language when she is angry, but claimed that she does not do so in front of her children.

Mr. Baumgartner testified at trial. He stated that his relationship with Mother lasted approximately three months, from about February to April 2010. In Mother's testimony, she was asked if she smoked marijuana with S.W.'s babysitter, Jennifer, and Mother denied doing so. Mr. Baumgartner rebutted Mother's testimony on that issue. He testified that, on one occasion when he was at Mother's apartment, he saw Mother and babysitter Jennifer smoking marijuana outside while J.R. and S.W. were inside. Mr. Baumgartner said that he told Mother that he did not agree with that behavior; Mother initially told him that she did not "think it was that big of a deal," but eventually agreed that it was not appropriate. Mr. Baumgartner confirmed that he gave Mother $3,200 to purchase a car, and by the time of trial, he no longer expected that the money would be repaid. During his short relationship with Mother, Mr. Baumgartner did not see behavior that indicated that she was particularly temperamental or untruthful.

J.R.'s father and grandmother both testified at trial. They both said Mother sent J.R. to be in their care for about eight or nine months after Mother and Father separated.[9] During this time, Mother had parenting time with J.R. every other weekend. J.R.'s father understood that Mother took J.R. back so that J.R.'s father would resume making child support payments to her that were suspended while the father had primary custody.

J.R.'s father and grandmother both said that Mother threatened them with reducing the father's parenting time with J.R. if they testified on Father's behalf in this lawsuit. They asserted that their relationship with Mother deteriorated after J.R.'s father filed a petition to modify his parenting arrangement to designate the father as primary residential parent. Once J.R.'s father filed the petition to modify, the grandmother said, "there's no talking. When I do see [Mother], she calls me names. She talks to [J.R.] about me because he's told me." J.R.'s grandmother testified that, on the morning of trial, she and Mother happened to be in the elevator at the same time, and Mother audibly called her a "bitch." The grandmother's assertion was corroborated by the testimony of a court officer who was in the same elevator, but Mother denied it in her testimony.

J.R.'s father and grandmother both expressed concern that Mother "move[s] around too much." J.R.'s father said, "I don't ever know where he's going to be at." J.R.'s grandmother said that, with Mother as J.R.'s primary residential parent, J.R. is "moving from place to place to place to place, there are so many men in and out of his life that I don't feel like he is okay with that. He gets tired of moving." Both agreed that, despite their concerns, J.R. is a smart, healthy, well-adjusted boy.

---

[9]J.R.'s father and grandmother do not live in the same house, but they apparently shared in the care of J.R. during this time.

-15-

Father's friend Jana Collins testified at trial on his behalf. She said that she and Father had been friends for about 12 or 13 years. She corroborated Father's testimony on Mother's warning when she picked up S.W. for Father's one-hour visit in March 2010. Ms. Collins testified that Father is "passionate about his daughter" and is "excellent" with the child. She said, "He tends to her every need[] and want[], and he wants to be with that little girl more than anything." Ms. Collins also corroborated Father's description of his New Jersey family as a "[l]oving, caring" family that is "always together, very supportive."

At the conclusion of the proof, the trial court issued an oral ruling from the bench. The court first declared the parties divorced, without assigning fault to either party.

The trial court then indicated that only remaining issue to be decided was the parenting arrangement for S.W. The trial court read through the statutory factors set out in Tennessee Code Annotated § 36-6-404(b). Without explanation, it then held that "[M]other should be declared the primary residential parent." The trial court held that Father would be permitted parenting time during the third week of each month, presumably in New Jersey, except that the parties would alternate parenting time with the child at Christmas. The trial court ordered that the party giving up the child would be responsible for taking the child to the other parent, and that Father would bear two-thirds of the expense, while Mother would bear one-third. The trial court determined the parties' income and income credits and instructed the parties to calculate the amount of child support due pursuant to the child support guidelines.

On September 13, 2012, the trial court entered an order clarifying its decision with respect to transportation of the child. On April 25, 2012, the trial court entered a final decree of divorce, identical in all relevant respects to the trial court's post-trial oral ruling. On May 8, 2012, the trial court approved the final parenting plan submitted it in accordance with its ruling.[10] Father now appeals the final decree and the parenting plan.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

Father raises two issues on appeal. He first argues that the trial court erred in declaring the parties divorced, rather than granting the divorce to him based on Mother's inappropriate marital conduct. Second, he argues that the trial court erred in designating Mother as S.W.'s primary residential parent; alternatively, he argues that the trial court erred in granting him only eight days per month of parenting time. Mother argues that Father's appeal is frivolous, and she seeks appellate attorney fees on that basis.

---

[10]Under the parenting plan, Father was ordered to pay Mother $833 per month in child support. Child support is not raised as an issue on appeal.

-16-

A trial court's decision to declare parties divorced, rather than granting a divorce to one of the parties, is reviewed under an abuse of discretion standard. *Irvin v. Irvin*, No. M2011-02424-COA-R3-CV, 2012 WL 5993756, at *18-19 (Tenn. Ct. App. Nov. 30, 2012) (citing *Jekot v. Jekot*, 232 S.W.3d 744, 753-54 (Tenn. Ct. App. 2007)), *perm. app. denied* (Tenn. Apr. 10, 2013). The Tennessee Supreme Court has described this standard of review:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). An abuse of discretion occurs when the lower court's decision is without a basis in law or fact and is, therefore, arbitrary, illogical, or unconscionable. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 191 (Tenn. 2000).

In addressing the propriety of a trial court's parenting plan, we review the trial court's findings of fact with a presumption of correctness unless the evidence preponderates otherwise. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984) (citing Tenn. R. App. P. 13(d)). In this case, we are unable to accord the trial court's findings of fact with a presumption of correctness, because the trial court made no findings of fact. As discussed below, in light of the trial court's failure to issue findings of fact, we conduct a review of the evidence to determine where the preponderance of the evidence lies.

"Trial courts have broad discretion to make decisions regarding parenting arrangements, but those determinations must be made based on proof and applicable principles of law." *Coley v. Coley*, No. M2007-00655-COA-R3-CV, 2008 WL 5206297, at *6 (Tenn. Ct. App. Dec. 12, 2008). In light of the deference given to the trial court's decision in custody matters, we will not disturb the trial court's parenting arrangement unless we determine that its decision is based on a material error of law, is against logic or reasoning, or is contrary to the preponderance of the evidence.[11] *Eldridge*, 42 S.W.3d at 85; *see also S.A.M.D. v. J.P.D.*,

---

[11] As we have stated, the trial court did not make factual findings, so we will review the evidence in the record to determine where the preponderance lies. After ascertaining the factual findings that are supported by the

(continued...)

No. W2011-01256-COA-R3-CV, 2012 WL 5266194, at *14 (Tenn. Ct. App. Oct. 25, 2012); ***Dobbs v. Dobbs***, No. M2011-01523-COA-R3-CV, 2012 WL 3201938, at *2 (Tenn. Ct. App. Aug. 7, 2012) (citing ***Adelsperger v. Adelsperger***, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). We review a trial court's application of the law to the facts *de novo*, with no presumption of correctness. ***State v. Ingram***, 331 S.W.3d 746, 755 (Tenn. 2011); ***Jahn v. Jahn***, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

**ANALYSIS**

**Rule 52.01 Findings of Fact**

At the outset, we must address the trial court's failure to make any findings of fact or conclusions of law under Rule 52.01 of the Tennessee Rules of Civil Procedure, or indeed to offer any explanation of the basis for its decision. Mother notes that the trial court prefaced its recitation of the parenting plan by saying that it "took into account" all of the listed factors, and she argues that the Tennessee divorce statutes do not require the trial court to make explicit findings of fact and conclusions of law. Therefore, Mother argues, no such factual findings were required of the trial court below.

We respectfully disagree. First, a recitation of the statutory factors is no substitute for findings of fact based on the evidence or conclusions of law that apply the law to the specific facts found. Second, regardless of whether the divorce statutes mandate findings of fact and conclusions of law, the applicable court rules do. Effective July 1, 2009, Rule 52.01 was amended to require trial courts to make specific finding of facts and conclusions of law in all bench trials:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. . . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rules 41.02 and 65.04(6).

Tenn. R. Civ. P. 52.01. Prior to July 1, 2009, trial courts were required to make specific findings of fact and conclusions of law only "upon request made by any party prior to the

---

[11](...continued)
preponderance of the evidence, we will then determine whether, based on those facts, the trial court abused its discretion in designating Mother as the child's primary residential parent.

entry of judgment." *Id.*, *quoted in* **Poole v. Union Planters Bank, N.A.**, 337 S.W.3d 771, 791 (Tenn. Ct. App. 2010) (noting the amendment). As amended, Rule 52.01 requires the trial court to make these findings, even if neither party requests them. **See Poole**, 337 S.W.3d at 791.

The importance of Rule 52.01 findings of fact and conclusions of law cannot be underscored enough, particularly in a fact-intensive matter such as a divorce in which the parenting arrangement is at issue. "Without such findings and conclusions, this court is left to wonder on what basis the [trial] court reached its ultimate decision." **In re K.H.**, No. W2008-01144-COA-R3-CV, 2009 WL 1362314, at *8 (quoting **In re: M.E.W.**, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. Apr. 21, 2004)). Even more importantly, the parties themselves deserve to know the factual basis for the trial court's decision on important issues such as which of them should be the primary residential parent for their child.

Since Rule 52.01 was amended to require findings of fact and conclusions of law even in the absence of a request, this Court has in numerous cases remanded the case to the trial court with directions to issue such findings and conclusions. **See, e.g., Pandey v. Shrivastava**, No. W2012-00059-COA-R3-CV, 2013 WL 657799, at *4 (Tenn. Ct. App. Feb. 22, 2013); **Hardin v. Hardin**, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *5 (Tenn. Ct. App. Dec. 27, 2012); **In re Connor S.L.**, No. W2012-00587-COA-R3-JV, 2012 WL 5462839, at *4-5 (Tenn. Ct. App. Nov. 8, 2012); **Simpson v. Fowler**, No. W2011-02112-COA-R3-CV, 2012 WL 3675321, *4-5 (Tenn. Ct. App. Aug. 28, 2012). This is because the absence of findings of fact and conclusions of law may render the appellate court unable to conduct an effective review of the trial court's decision. **See Pandey**, 2013 WL 657799, at *6 (remanding case because unable to conduct meaningful review); **Estate of Bucy v. McElroy**, No. W2012-02317-COA-R3-CV, 2013 WL 1798911, at *3 (Tenn. Ct. App. Apr. 26, 2013) (noting that Rule 52.01 requirement serves purpose of facilitating appellate review).

In the absence of findings of fact and conclusions of law, however, the appellate court may choose to conduct its own independent review of the record to determine where the preponderance of the evidence lies, without presuming the trial court's decision to be correct. **See Kendrick v. Shoemake**, 90 S.W.3d 566, 570 (Tenn. 2002); **Brooks v. Brooks**, 992 S.W.2d 403, 405 (Tenn. 1999); *see also Coley*, 2008 WL 5206297, at *6-7; **Curtis v. Hill**, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006). In this case, we deem it prudent to do so. **See In re S.J.**, 387 S.W.3d 576, 594 n.9 (Tenn. Ct. App. 2012).

## Declaration of Divorce

Father argues first that the trial erred in simply declaring the parties to be divorced without making any findings of fact to support its decision.[12] He contends that the evidence in the record demonstrates Mother's inappropriate marital conduct, such as undisputed evidence that the parties separated because of Mother's unreasonable and combative behavior during their short-lived marriage. Based on this evidence, he claims, the trial court should have awarded the divorce to him. In response, Mother maintains that the trial acted well within its discretion to declare the parties divorced. Trial courts are given broad discretion in such matters, Mother notes, and its decision to declare the parties divorced was among the acceptable alternatives, given the evidence presented at trial.

We agree with Mother. From our review, the record contains evidence to support a finding that both parties played a role in the demise of their marriage. "Fault for the demise of a marriage can take many forms." *Irvin*, 2012 WL 5993756, at *19. It is undisputed that the parties fought frequently and that Mother was outwardly hostile toward Father — oftentimes yelling, acting out, and cursing. But Father chose to load Mother's personal belongings into a U-Haul and physically move her back to Tennessee, away from the marital home in New Jersey, without her consent. Mother testified that she asked Father to seek counseling for their marriage, but he did not do so, and Father did not dispute Mother's assertion. Therefore, even if Mother's behavior prompted the separation, Father refused to engage in any meaningful attempt at counseling or reconciliation. Under the circumstances of this case, we agree with Mother that declaring the parties to be divorced, rather than granting a divorce to Father alone, was among the acceptable alternatives available to the trial court. *See id.* Therefore, we reject Father's first assignment of error.

## Parenting Plan

Next, Father challenges the trial court's decision to designate Mother as S.W.'s primary residential parent. He contends that the proof shows that he offers a stable, secure home for the parties' child, with a supportive extended family. The proof shows that Mother, he argues, "subjected both of her children to a revolving door of men with whom she has engaged in sexual relations, drug use, and emotional instability." Mother argues that the trial court's ruling is in the child's best interest, and points out that the proof shows that Father

---

[12]The trial court stated in the final decree that it declared the parties divorced "pursuant to T.C.A. § 36-4-119." The statutory basis for declaring the parties divorced "rather than awarding a divorce to either party alone" is found in Tennessee Code Annotated § 36-4-129. *See Jekot v. Jekot*, 232 S.W.3d 744, 753-54 (Tenn. Ct. App. 2007).

-20-

abandoned Mother and their unborn child after moving Mother back to Tennessee shortly before S.W. was born.

In making decisions regarding the proper parenting arrangement for a child, "the child's best interest is the paramount consideration. It is the polestar, the *alpha and omega*." *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983); *see* Tenn. Code Ann. § 36-6-401(a).

In order to devise an initial parenting arrangement that is in the best interest of a minor child who is the subject of litigation, the trial court must engage in a "comparative fitness" analysis to determine which of the available custodians is comparatively more fit to care for the child. *See Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996); *Bah*, 668 S.W.2d at 666. "Fitness for custodial responsibilities is largely a comparative matter. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others." *Bah*, 668 S.W.2d at 665-66 (citing *Edwards v. Edwards*, 501 S.W.2d 283, 290-91 (Tenn. Ct. App. 1973)).

"There are literally thousands of things that must be taken into consideration" in making a comparative fitness determination. *Id.* at 666. To guide the courts in this analysis, Tennessee Code Annotated § 36-6-404(b) sets forth factors to be considered in designing or approving a parenting plan as a part of divorce proceedings.[13] *See Bryant v. Bryant*, No. M2007-02386-COA-R3-CV, 2008 WL 4254364, at *5-6 (Tenn. Ct. App. Sept. 16, 2008)

---

[13]Tennessee Code Annotated § 36-6-404, requires a trial court to devise a parenting plan for any minor child involved in a divorce; it further provides that the trial court "shall make residential provisions for each child" in the permanent parenting plan. Tenn. Code Ann. § 36-6-404(b). In making these residential provisions, and in choosing which parent shall be the child's primary residential parent, the trial court is required to consider the 16 factors in Section 36-6-404(b). In addition, Tennessee Code Annotated § 36-6-106 provides that, in a divorce case "or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child." *Id.* § 36-6-106(a). To a large extent, the factors listed in Section 36-6-404(b) and Section 36-6-106(a) are the same. This Court has recognized that "[t]here is little substantive difference between the factors applicable to parenting plans, set out in Tenn. Code Ann. § 36-6-404(b), and those applicable to custody determinations, set out in Tenn. Code Ann. § 36-6-106(a) as far as determining comparative fitness and the best interests of the child." *Dobbs*, 2012 WL 3201938, at *1 n.1 (citing *Dillard v. Dillard*, No. M2007-00215-COA-R3-CV, 2008 WL2229523, at *10 (Tenn. Ct. App. May 29, 2008)). The primary issue in the instant appeal is whether the evidence supports the trial court's finding that Mother is the comparatively more fit parent when applying the factors in Section 36-6-404(b). The trial court recited those factors in its analysis, and we will apply those same factors in our analysis. *See id.* However, in this case, we need not address which statutory factors govern because we would reach the same conclusion considering the relevant "best interest" factors in Section 36-6-106.

(citing ***Cain v. Cain***, No. M2006-02259-COA-R3-CV, 2008 WL 2165963, at *5 (Tenn. Ct. App. May 16, 2008)).  Those factors are as follows:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-404(b) (2010). The list includes a "catch-all" provision, permitting the court to consider "[a]ny other factors" the court deems relevant. Tenn. Code Ann. § 36-6-404(b)(16).

From our careful review of the record, we are of the view that the undisputed evidence preponderates against the trial court's implicit finding that Mother is the more comparatively fit parent, as the necessary basis for its decision to designate Mother as S.W.'s primary residential parent. In reviewing the evidence, we are mindful of the fact that the parties disputed some of the evidence submitted, and we do not have the benefit of explicit credibility determinations by the trial court. Nevertheless, in reviewing the record, we find that a clear picture of the parties' comparative fitness emerges from the evidence that is unrebutted or not in dispute.

To be sure, neither party is perfect, and as set forth above, Father shares the blame in the demise of the marriage and the situation that existed when S.W. was born. The evidence showed that Father rather abruptly moved Mother, then pregnant, from New Jersey to Tennessee. The parties dispute the amount of financial support Father gave to Mother at that time, but the record indicates that the financial resources available were scarce under either party's version of the facts. The record indicates that, prior to the marriage, Mother had stable housing and employment, but landed back in Tennessee pregnant and unemployed, with no car and with little available money. It was inevitable under those circumstances that Mother's home environment would have some instability for a period of time, and Father bears significant responsibility for that.

Our task, however, is not to allocate blame between the parents, but to determine which parent will provide a home for S.W. that is in her best interest. Even factoring in the instability caused to Mother by the parties' sudden separation, the lack of financial resources, and the overall circumstances into which S.W. was born, the undisputed evidence shows that Mother consistently exercised poor judgment and is less likely than Father to provide the child with a safe, secure, and stable home.

In her testimony, Mother did not explain why she chose to move herself and her two children into the home of Mr. Baldwin, who was married to another person at the time. While they were living with Mr. Baldwin, Mother allowed S.W., a mobile one-year old, to sleep on a mattress sitting on the bedroom floor, with no rails on the bed. The photos Mother posted on her Facebook page indicate that toddler S.W. was encouraged to form an affectionate relationship with Mr. Baldwin, and then Mother and the children were forced to move after only four months because Mr. Baldwin decided to reconcile with his wife.

Indeed, by Mother's undisputed testimony, she had sexual relationships with at least five other men during her marriage to Father. Some of these had exposure to the children, some did not. Mother's serial relationships led J.R.'s father and grandmother to testify about their concern related to "so many men in and out of" J.R.'s life, and consequently S.W.'s life as well. It perhaps explains J.R.'s poignant comment to Father: "You won't stay. None of them do."

Mother's sexual partners and proclivities figured prominently in the evidence presented to the trial court below. By the time of trial, Mother could "see that there's a problem with" the graphic "sext" photos sent to Father and other men, but it is disturbing that it took child custody litigation for Mother to realize it. Also troubling was Father's testimony that Mother did not want him to close the bedroom door during sex, knowing that J.R. was just down the hallway, and that Mother instead shouted to the ten-year-old boy that he had "better not" come down the hall. This incident, along with the explicit photos and the numerous men brought into contact with both children, are relevant to an assessment of Mother's "character" as it relates to her "ability to parent" her young daughter. Tenn. Code Ann. §36-6-404(b)(9).

The undisputed evidence also established Mother's tendency to be insensitive or volatile, and her apparent inability to restrain her temper, even in the presence of her children. Mother's testimony indicated that she saw nothing wrong with laughing at her young son's fearfulness of a ride at the amusement park, all the while taking pictures; she explained that the child was

not really crying, he was actually "mad."[14]   Of course any child would be mad at the humiliation of being taunted.  Mother did not dispute Father's description of her ranting, paranoid behavior during the eight weeks in which they lived together, or even her threat to kill their unborn daughter with a butcher knife.  The New Jersey police report confirmed Father's testimony that Mother drove from Tennessee to New Jersey with S.W. in the car, arrived uninvited at his family's beach house, and proceeded to pound and kick on the door and hurl profanities at the alarmed inhabitants, including children, all in full view of her own infant daughter.  The recording of Mother's cell phone conversation with Father, with S.W. in the vehicle with her, was alarming for reasons beyond the vile language.  Even a very young child who could not understand the obscenities would feel unsettled by the rage in Mother's voice and her actions behind the wheel.  All of this must be considered in the assessment of the parties' relative "emotional fitness" and ability to provide the child with an environment that is both physically and emotionally safe.

The evidence in the record also appears to favor Father on the parties' relative "willingness . . . to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent . . . ."  Tenn. Code Ann. §36-6-404(b)(3).  The evidence showed that, when Father traveled from New Jersey to Tennessee with his brother and his friend for a five-day visit, Mother allowed Father to see the child for only one hour, under threat that she would call the police.[15]   During the pendency of the litigation, Mother also opposed Father taking the child to New Jersey; this was ostensibly based on his failure to return S.W. to her custody after her ill-fated trip to the New Jersey beach house.  Of course Mother's behavior, described above, fully justified Father's reluctance to relinquish their daughter to her. We find that the evidence in the record on this statutory factor weighs in favor of Father. *Id.* at § 36-6-404(b)(3).

The undisputed evidence also shows that Father offers a safer, more stable home environment for S.W.  At the time of trial, Mother was living with her father and his wife; there was no evidence that their home was unsuitable or that Mother would be asked to leave. However, Mother's dismissive response to Father's concerns about her stepbrother, and Mother's choice to suddenly move her children into Mr. Baldwin's home without even a proper crib for S.W., both indicate instability.  Father, on the other hand, has maintained financial stability, reliable employment, and adequate housing, due in large part to his

---

[14]Mother testified that, on this occasion, Father laughed at J.R. also.

[15]Mother testified implausibly that Father only wanted one hour of visitation with S.W. over the course of the five-day visit to Tennessee. We recognize that the appellate court is at a disadvantage in assessing the credibility of Mother's assertion because we did not see this testimony, but we also have not taken leave of our senses.

relationship with his brother James Ward. Father submitted photographs into evidence to show that he is prepared to accept S.W. into his home, showing that Father has made his home "childproof" for S.W. Father's testimony indicates that he has made the child's moral well-being a priority by taking her to church every time he has parenting time with her. Father also demonstrated that he enjoys the strong support of his extended family, and they are committed to helping Father with S.W.'s needs. He testified that, if he were designated as primary residential parent, S.W. would be cared for by family members at no cost while he was at work. In weighing the evidence, we must also consider evidence such as Mother's testimony that Father engaged in objectionable behaviors, such as "introducing" her to sending explicit sexual text message photographs and threatening to "starve" her into agreeing to his divorce-related demands. However, none of the evidence submitted at trial suggests that Father would expose his daughter to a parade of sexual partners or that he would otherwise exhibit poor judgment about her care.

Other factors weigh in favor of Mother, specifically, "[t]he degree to which a parent has been the primary caregiver" and continuity of care. *Id.* at § 36-6-404(b)(6), (11). Mother has been S.W.'s primary caregiver since her birth. Mother took responsibility for providing S.W. with food, clothing, and other daily needs during her first few years of life. The evidence shows that Mother has a close, loving relationship with the child, and her father and her friend corroborated Mother's testimony that she is a good parent to S.W. *Id.* at § 36-6-404(b)(2), (6).

We have previously acknowledged that continuity and the parent who has been the child's primary caregiver are often "powerful considerations" in custody disputes. *Wall v. Wall*, No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at *30 (Tenn. Ct. App. July 14, 2011). Continuity of care, however, "does not trump all other considerations." *Gaskill*, 936 S.W.2d at 630. "Depending on the facts, a parent who has been a child's primary caregiver may not necessarily be comparatively more fit than the other parent to have permanent custody of the child." *Id.* at 630-31. The purpose of the emphasis on continuity and the primary caregiver is to provide children without an intact family with as much stability and security as possible. In this case, as in *Wall*, "[t]he evidence in the record . . . shows that continuity in this case does not equal stability, because Mother has not provided [S.W.] a 'stable, satisfactory environment.' " *Wall,* 2011 WL 2732269, at *30 (quoting Tenn. Code Ann. § 36-6-106(a)(3)).

"[The] decision regarding a child's best interest should . . . be designed to 'promote children's best interest by placing them in an environment that will best serve their physical and emotional needs.'" *Id*. at *26 (quoting *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983)). When this record is considered as a whole, the evidence clearly preponderates in favor of a factual finding that Father is the more comparatively fit parent for S.W., and that

S.W.'s best interests are served by designating Father as the child's primary residential parent. *See S.A.M.D.*, 2012 WL 5266194, at *18 (noting that the mother "had a golden opportunity to create a stable, healthy environment" for her child, but failed to do so, making it in the child's best interest to designate the father the child's primary residential parent). The trial court's custody decision "must be based on proof and applicable principle of law." *Coley,* 2008 WL 5206297, at *6. In light of our holding on the preponderance of the evidence in this record, we must respectfully conclude that the trial court abused its discretion in designating Mother as the primary residential parent of S.W., and we reverse its decision on this basis.

Thus, we must respectfully reverse the trial court's decision on the parties' parenting arrangement and vacate the parenting plan approved by the trial court. We remand for the entry of an order and parenting plan designating Father as the child's primary residential parent, with provisions for appropriate alternative parenting time for Mother, and for any further proceedings consistent with this opinion.

### Appellate Attorney Fees

On appeal, Mother contends that she is entitled to attorney fees from Father based on a frivolous appeal. In light of our decision, we decline Mother's request for an award of attorney fees.

### CONCLUSION

The final decree is affirmed in part, reversed in part, and vacated in part, as set forth above; the cause is remanded for further proceedings consistent with this opinion. Costs on appeal are to be taxed one-half to Appellant John Patrick Ward and his surety, and one-half to Appellee Tera Danielle Ward, for which execution may issue if necessary.

 

_____
HOLLY M. KIRBY, JUDGE